Slip Op. 07-35

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **THAI I-MEI FROZEN FOODS CO., LTD.,** | |
| Plaintiff, | |
| v. | **Before: Timothy C. Stanceu, Judge** |
| **UNITED STATES,** | **Court No. 05-00197** |
| Defendant. | |

## OPINION AND ORDER

[Granting in part plaintiff's motion for judgment on the agency record and remanding to the United States Department of Commerce the final determination in an antidumping duty investigation for reconsideration and additional explanation of one aspect of the calculation of the constructed value profit rate]

Dated: March 12, 2007

*Steptoe & Johnson LLP* (*Eric C. Emerson* and *Michael T. Gershberg*) for plaintiff.

*Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Matthew D. Walden*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Stanceu, Judge: Plaintiff Thai I-Mei Frozen Foods Co., Ltd. ("plaintiff" or "Thai I-Mei"), a shrimp producer and exporter located in Thailand, contests an amended final "less than fair value" determination issued on February 1, 2005 by the United States Department of Commerce ("Commerce") in an antidumping investigation of imports of certain frozen warmwater shrimp from Thailand. Plaintiff, a respondent in the antidumping investigation that resulted in the contested determination, alleges that Commerce acted contrary to law in calculating a

constructed value profit rate for Thai I-Mei's merchandise that was based on the profits realized by two other respondents in the antidumping investigation, Rubicon Group and The Union Frozen Products Co., Ltd. ("Union Frozen Products"), in their sales of shrimp in a third country market (in this instance, Canada). Commerce rejected Thai I-Mei's proposal that the constructed value profit rate be calculated from data that Thai I-Mei compiled from the financial statements of selected member companies of the Thai Frozen Foods Association, which data plaintiff had provided to Commerce during the investigation. Plaintiff argues, further, that Commerce improperly limited the calculation of the constructed value profit rate by basing it exclusively on sales of shrimp made in the ordinary course of trade. Plaintiff moves under USCIT R. 56.2 for judgment on the agency record, seeking a remand that directs Commerce to recalculate a constructed value profit rate under a different method; plaintiff submits that the only reasonable method on remand would involve use of the data and method that plaintiff advocated during the investigation.

The court does not find merit in plaintiff's argument that the governing statute prevented Commerce from basing a constructed value profit rate on profits realized by other respondents on sales in a third country market. The court also concludes that plaintiff did not place on the record of the investigation a set of data that Commerce would have been obligated to use in calculating a constructed value profit rate. The court concludes, further, that plaintiff did not exhaust its administrative remedies. Therefore, the court declines to order Commerce to recalculate Thai I-Mei's constructed value profit rate according to a different set of data.

The court concludes that Commerce failed to provide an explanation adequate to justify its method of calculating the constructed value profit rate by excluding third country sales by the

other two respondents that were outside of the ordinary course of trade.  For this reason, the court

remands this matter to Commerce for reconsideration of this aspect of the contested

determination.  The court directs Commerce either to modify this aspect of the determination or

to provide an explanation of why its exclusion of the sales outside of the ordinary course of trade

produced a result that is supported by substantial evidence and is otherwise in accordance with

law.

## I. BACKGROUND

In an antidumping investigation, if both Commerce and the United States International

Trade Commission ("Commission") have issued affirmative final determinations, Commerce

issues an order assessing antidumping duties on imports of the merchandise that is the subject of

the investigation (the "subject merchandise").  19 U.S.C. § 1673 (2000).  Commerce determines

whether the subject merchandise is being unfairly traded, *i.e.*,  "dumped," because it is being sold

or likely to be sold in the United States for less than its "normal value," and also determines the

degree of dumping, *i.e.*, the "dumping margin."  *See id.* §§ 1673d(a)(1), 1677(34)-(35),

1677b(a) (2000).  In calculating the dumping margin, Commerce determines to what extent the

"normal value" (or "constructed value") of the "foreign like product"[1] exceeds the price at which

---

[1] The term "foreign like product" means, in descending order, "subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that [subject] merchandise"; merchandise that is "like that [subject] merchandise in component material or materials and in the purposes for which used, . . . approximately equal in commercial value to that [subject] merchandise," and "produced in the same country and by the same person as the subject merchandise"; merchandise that is "of the same general class or kind as the subject merchandise," is "like that [subject] merchandise in the purposes for which used," "may reasonably be compared with that [subject] merchandise" as determined by Commerce, and is "produced in the same country and by the same person" as the subject merchandise.  19 U.S.C. § 1677(16).

the subject merchandise is sold in the United States (the "export price" or the "constructed export price").[2] *See id.* § 1677b(a). The Commission, in the preliminary phase of its investigation, ordinarily determines whether there is a reasonable indication that a domestic industry is suffering material injury or threat of material injury by reason of imports of the subject merchandise. *See id.* § 1673b(a). In the final phase of its investigation, the Commission ordinarily determines whether an industry in the United States actually is being materially injured, or threatened with material injury, by reason of imports, or sales for importation, of the merchandise for which Commerce made an affirmative final determination. *See id.* § 1673d(b)(1).

The amended final determination at issue resulted from an antidumping investigation of imports of certain frozen and canned warmwater shrimp that Commerce initiated on January 27, 2004. *See Notice of Initiation of Antidumping Duty Investigations: Certain Frozen and Canned Warmwater Shrimp From Brazil, Ecuador, India, Thailand, the People's Republic of China and the Socialist Republic of Vietnam*, 69 Fed. Reg. 3876 (Jan. 27, 2004). Upon determining that Thai I-Mei was one of the largest producers and exporters in Thailand of the subject merchandise, Commerce designated Thai I-Mei as a mandatory respondent. App. to Def.'s Mem. in Resp. to Pl.'s Motion for J. Upon the Agency R. ("App. to Def.'s Mem.") Ex. 2

---

[2] "Export price" is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," with certain adjustments. 19 U.S.C. § 1677a(a), (c). "Constructed export price" is, in the usual instance, "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," with certain adjustments. *Id.* § 1677a(b)-(d).

(*Letter from Analyst/IA to Office Dir/IA: Selection of Respondents Memo* (Feb. 20, 2004)).  In

their respective investigations, the Commission and Commerce issued affirmative preliminary

determinations.  *Certain Frozen or Canned Warmwater Shrimp and Prawns from Brazil, China,*

*Ecuador, India, Thailand, and Vietnam*, 69 Fed. Reg. 9842 (Mar. 2, 2004) (ITC Investigations

Nos. 731–TA–1063–1068 (Preliminary)); *Notice of Preliminary Determination of Sales at Less*

*Than Fair Value, Postponement of Final Determination, and Negative Critical Circumstances*

*Determination: Certain Frozen and Canned Warmwater Shrimp From Thailand*,

69 Fed. Reg. 47,100 (Aug. 4, 2004) ("*Preliminary Determination*").

In the antidumping investigation, Commerce found that Thai I-Mei had no viable home

market in Thailand and no viable third country markets for sales of the foreign like product.  As a

result, Commerce was unable to calculate the normal value of the subject merchandise that Thai

I-Mei sold in the United States according to the usual method, *i.e.*, compiling data of the sales of

the foreign like product by Thai I-Mei in Thailand or in a third country market.  *See* 19 U.S.C.

§ 1677b(a)(1), (4).  Therefore, in both the preliminary and final phases of its antidumping

investigation, Commerce calculated the normal value of Thai I-Mei's merchandise based on

"constructed value."  *See id.* § 1677b(e).  Under that statutory provision, the constructed value of

the merchandise of a respondent producer or exporter ordinarily is calculated as the sum of

(1) the cost of materials and processing used in producing the merchandise, during a period

which would ordinarily permit the production of the merchandise in the ordinary course of

business; (2) the actual selling, general, and administrative expenses incurred by the producer or

exporter and *actual profits* realized by the producer or exporter, in connection with the

production and sale of a foreign like product, in the ordinary course of trade, for consumption in

the foreign country (*i.e.*, in this case, Thailand); and (3) the costs of all containers and coverings and all other expenses incidental to placing the subject merchandise in condition packed ready for shipment to the United States. *Id.* § 1677b(e)(1), (e)(2)(A), (e)(3).

Because Thai I-Mei had no viable market in Thailand for sales of the foreign like product, profit for purposes of determining constructed value could not be calculated according to the usual method under "constructed value," *i.e.*, compiling data for the actual amounts of profit realized by the specific exporter or producer being examined in the investigation in connection with the production and sale of the foreign like product, in the ordinary course of trade, for consumption in the foreign country. Commerce, therefore, calculated the profit rate using one of the methods that are specified, in three separate clauses (clauses (i), (ii) and (iii)), in 19 U.S.C. § 1677b(e)(2)(B).

Clause (i) of 19 U.S.C. § 1677b(e)(2)(B) provides a method under which profit, as calculated for purposes of determining constructed value, is based on the actual amounts of profit realized by the respondent exporter or producer in connection with the production and sale for consumption in the foreign country of merchandise that is in the *same general category of products* as the subject merchandise. *Id.* § 1677b(e)(2)(B)(i). Because Thai I-Mei had no viable market in Thailand for merchandise in the same general category of products as the subject merchandise, Commerce concluded that it could not proceed under clause (i).

Under clause (ii), constructed value profit may be based on the weighted average of actual profits realized by *other* respondent producers or exporters in the investigation in connection with the production and sale of a *foreign like product*, in the ordinary course of trade, for consumption in the foreign country. *Id.* § 1677b(e)(2)(B)(ii). Because neither of the other

mandatory respondents in the investigation, Rubicon Group and Union Frozen Products, had a

viable market in Thailand for the foreign like product, Commerce concluded that the alternative

presented in clause (ii) also was unavailable.

Clause (iii) of 19 U.S.C. § 1677b(e)(2)(B) provides that the determination of amounts

realized for profits, as a component of constructed value, may be determined

> based on any other reasonable method, except that the amount allowed for profit
> may not exceed the amount normally realized by exporters or producers (other
> than the exporter or producer described in clause (i) [*i.e.*, the exporter or producer
> being examined in the investigation]) in connection with the sale, for consumption
> in the foreign country, of merchandise that is in the same general category of
> products as the subject merchandise . . . .

*Id.* § 1677b(e)(2)(B)(iii).  The provision in the statutory text beginning with "except that" is

commonly referred to as the "profit cap."  *See Uruguay Round Agreements Act*, *Statement of*

*Administrative Action*, H.R. Doc. No. 103-316, at 840 (1994), *as reprinted in* 1994 U.S.S.C.A.N.

4040, 4198 ("*SAA*").

Plaintiff does not dispute that the alternative method allowed under clause (iii) was the

only method available by which Commerce could calculate profit for purposes of determining the

constructed value of Thai I-Mei's merchandise.  Instead, the dispute in this case arises because of

the particular method Commerce used to determine a constructed value profit rate for Thai I-Mei

under clause (iii).  Plaintiff argues that because this method was based on the profit realized by

the two other mandatory respondents in third country sales, and because it excluded sales that

were not in the ordinary course of trade, the method was impermissible under the statute and

unsupported by substantial evidence on the record.

In a submission made in July 2004, Thai I-Mei submitted for the record publicly available financial statements of 73 Thai companies, advocating that Commerce use profit data in these financial statements to calculate a constructed value profit rate for Thai I-Mei. App. to Def.'s Mem. Ex. 3 at 5-6, 11-12 (*Letter from Steptoe & Johnson to Sec'y of Commerce* (July 9, 2004)). The 73 Thai companies were members of the Thai Frozen Food Association ("TFFA"). *Id.* Ex. 3 at 5, 11. Thai I-Mei had selected the 73 companies from a larger group of 95 TFFA member companies according to criteria that Thai I-Mei devised, arguing that these criteria made the profit data suitable for calculating a constructed value profit rate. *Id*. Ex. 3 at 5-11. Plaintiff selected TFFA member companies with business operations and products it considered to be similar to those of Thai I-Mei, excluding companies that did not produce seafood products. *Id*. Ex. 3 at 5 & n.5. Thai I-Mei also excluded TFFA member companies with financial statements pertaining to periods that did not overlap, at least in part, with the period of investigation, which was October 1, 2002 to September 30, 2003. *Id*. Ex. 3 at 7; Ex. 2 at 1 (listing the dates of the period of investigation). From calculations using the financial data of the 73 companies, Thai I-Mei advocated a constructed value profit rate of zero (based on a weighted average of -0.28 percent, derived from the data for all 73 companies) or alternatively, a constructed value profit rate of 0.87 percent (based on a weighted average derived from the data of the companies showing a profit). *Id*. Ex. 3 at 10-11.

In its Preliminary Determination, Commerce did not discuss the information in Thai I-Mei's July 2004 submission. *Preliminary Determination*, 69 Fed. Reg. at 47,109. Instead, Commerce announced that it had calculated Thai I-Mei's constructed value profit rate based on a weighted average of the profits realized by Rubicon Group and Union Frozen Products in these

respondents' third country sales of the foreign like product in Canada. *Id.* With respect to those third country sales, Commerce determined that more than 20 percent of sales were made at prices below the cost of production and at prices that would not permit the recovery of all costs within a reasonable period of time. *Id.* at 47,108. Commerce excluded these sales when constructing plaintiff's profit rate, concluding that these sales were outside the "ordinary course of trade." *Id.* at 47,108-09. The calculation by Commerce yielded a profit rate for Thai I-Mei of 9.67 percent. Br. in Supp. of Pl.'s Mot. for J. on the Agency R. 6 ("Pl.'s Br."). In the Preliminary Determination, Commerce cited to the profit cap provision of 19 U.S.C. § 1677b(e)(2)(B)(iii) but did not calculate a profit cap. Commerce explained why it declined to calculate a profit cap:

> Pursuant to alternative (iii), the Department has the option of using any other reasonable method, as long as the amount allowed for profit is not greater than the amount realized by exporters or producers "in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise," the "profit cap." We are unable to calculate the profit cap because the available data (*i.e.*, the Rubicon Group and UFP [Union Frozen Products] data) are based solely on the third country sales, and thus cannot be used under 19 CFR 351.405(b). Therefore, as facts available we are applying option (iii), without quantifying a profit cap.

*Preliminary Determination* at 47,109.[3]

In a submission made just after publication of the Preliminary Determination, Thai I-Mei reiterated its arguments for use of the TFFA data, responded to points made by the petitioners in the investigation opposing the use of those data, and refined its analysis. App. to Def.'s Mem. Ex. 5 (*Letter from Steptoe & Johnson to Sec'y of Commerce* (Aug. 11, 2004)). In rebuttal of a point made by petitioners, Thai I-Mei characterized the profit rates of the 73 selected TFFA

---

[3] The Commerce regulations, at 19 C.F.R. 351.405(b)(2), define "foreign country" for purposes of 19 U.S.C. § 1677b(e)(2)(B) as "the country in which the merchandise is produced."

companies as not being based on sales made exclusively or predominantly to the United States. *Id.* Ex. 5 at 6. Thai I-Mei argued to Commerce that only the TFFA data it submitted, and not the data underlying the weighted average of the profit and selling expenses incurred by the two other respondents in the investigation, met the reasonableness test of 19 U.S.C. § 1677b(e)(2)(B)(iii). *See id.* Ex. 5 at 9-10. In the August 2004 filing, plaintiff provided additional information, which it identified as a further demonstration that (1) the companies used in the TFFA data have operations and products similar to those of Thai I-Mei; (2) the financial information on which plaintiff's proposed constructed value profit rate was based reflects a substantial portion of sales to countries other than the United States; and (3) plaintiff's use of 2002 and 2003 constructed value profit data was appropriate and reasonable. *Id.* Ex. 5 at 2. Plaintiff contended in the August submission that a "more conservative approach," under which plaintiff had identified a smaller group of companies for use as sources of constructed value profit data, also would yield a reasonable profit rate for Commerce's final determination. Thai I-Mei's calculations produced a weighted average constructed value profit rate of 1.23 percent, and, alternatively, a straight average constructed value profit rate of 0.76 percent. *Id.* Ex. 5 at 10.

Plaintiff submitted a case brief, dated October 27, 2004, responding to the Preliminary Determination. *Id.* Ex. 6 (*Plaintiff's Case Brief* (Oct. 27, 2004)). In this brief, among other challenges, plaintiff again contested Commerce's use of respondents' third country sales as the basis for constructed value profit and advocated use of the TFFA data. *Id.* Ex. 6 at 2-10. Commerce addressed plaintiff's comments in a memorandum issued concurrently with the agency's final determination (the "Decision Memorandum"). *Id.* Ex. 7 (*Mem. from Barbara E. Tillman, Acting Deputy Assistant Sec'y for Imp. Admin., to James J. Jochum, Assistant Sec'y for*

*Imp. Admin.* (Dec. 23, 2004)) ("*Decision Mem.*").  Commerce explained that, while plaintiff's

profit and selling expenses were based on clause (iii) of 19 U.S.C. § 1677b(e)(2)(B)(iii), it was

"unable to calculate the profit cap because it is required to be based on profit in the home market

and the Rubicon Group's and UFP's profit are based on the third country market, nor is there any

evidence on the record that demonstrates that there is a market for subject merchandise in

Thailand." *Decision Mem.* at 44-45.  Commerce added that "[t]herefore, as facts available, we

applied option (iii) without quantifying a profit cap." *Id.* at 45.  Commerce stated that,

notwithstanding plaintiff's arguments to the contrary, 19 U.S.C. § 1677b(e)(2)(B)(iii) did not

contain a restriction that profit must be related to sales in the domestic market of the country of

origin, adding that the use of constructed value profit rates derived from third country sales of the

other respondents in the investigation was fully consistent with Commerce's practice and the

statute.  *Id.* at 46.  Commerce provided several reasons for its determination that the weighted-

average profit rate of the other respondents was a reasonable method:

> First, the products sold by the other respondents in their respective third country
> markets are substantially similar to those sold by Thai I-Mei (*i.e.*, sales of frozen,
> head-off, cooked and uncooked shrimp).  Second, the CV profit rate for the other
> respondents excludes sales to the United States.  Third, the weighted-average CV
> profit rate calculated for the other respondents covers a time frame that is
> contemporaneous with the POI.  Fourth, the Rubicon Group, UFP, and Thai I-Mei
> sold subject merchandise to both distributor/wholesalers and retailers during the
> POI (*i.e.*, they had the same type of customer base).  The Department also verified
> the other respondents' third country market information and ascertained the
> reliability of the data.

*Id.* at 45.  Commerce found that plaintiff's proposed method for calculating the constructed value

profit was not preferable:

> First, Thai I-Mei did not provide information demonstrating that the business
> operations and product mix of the 60 companies it used in its profit calculation
> were more similar to its own than that of the Rubicon Group and UFP.  Second,

Thai I-Mei's method included sales to the United States, contrary to the Department's practice. Last, Thai I-Mei's method is less contemporaneous with the POI than the Department's method and Thai I-Mei did not provide any information to demonstrate that the customer bases of the surrogate companies are similar to its own customer base.

*Id.* at 45-46. Commerce concluded that, for these and other reasons, "the use of the other respondents' weighted-average profit rate for the final determination is not only reasonable, but also preferable to the alternative methodology proposed by Thai I-Mei." *Id.* at 47. In calculating the weighted average profit rate, Commerce excluded the other respondents' sales made outside the ordinary course of trade. *Id.* at 46. According to plaintiff, this method resulted in a profit rate of 9.67 percent, which Commerce used to calculate plaintiff's constructed value. Pl.'s Br. 6.

Commerce issued its final determination on December 23, 2004, in which it found that certain frozen and canned warmwater shrimp from the exporting countries are being, or are likely to be, sold in the United States at less than fair value. *See Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp From Thailand*, 69 Fed. Reg. 76,918, 76,918 (Dec. 23, 2004) ("*Final Determination*"). In the Final Determination, Commerce assigned Thai I-Mei a weighted-average dumping margin of 6.20 percent. *Id.* at 76,920. On December 30, 2004, plaintiff filed comments alleging ministerial errors in the final margin calculations. Commerce published its amended final determination and antidumping duty order on February 1, 2005 ("Amended Final Determination"). *See Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from*

*Thailand*, 70 Fed. Reg. 5,145 (Feb. 1, 2005) ("*Am. Final Determination*"). Upon correction of ministerial errors, Commerce lowered plaintiff's weighted average dumping margin to 5.29 percent. *Id.* at 5,146.

Plaintiff moves for judgment on the agency record pursuant to USCIT R. 56.2, advancing in its motion several arguments, summarized below, as to why the Amended Final Determination, in calculating plaintiff's constructed value profit rate as the weighted average of the other respondents' profit rates in their largest third country markets and in excluding from the calculation sales not in the ordinary course of trade, is unsupported by substantial evidence on the record and is otherwise not in accordance with law. As noted previously, plaintiff seeks as relief a remand of the Amended Final Determination to Commerce under which the court would instruct Commerce to apply the specific methodology proposed by plaintiff as the only reasonable method supported by the record to calculate constructed value profit under 19 U.S.C. § 1677b(e)(2)(B)(iii). *See* Pl.'s Br. 27.

## II. DISCUSSION

The court exercises jurisdiction according to 28 U.S.C. § 1581(c) (2000), under which the Court of International Trade has exclusive jurisdiction of a civil action commenced under Section 516A of the Tariff Act of 1930, 19 U.S.C. § 1516a (2000). This action was commenced under 19 U.S.C. § 1516a(a)(2)(B)(i), which subjects to judicial review a final affirmative less than fair value determination by Commerce. The standard of review that the court is to apply to the contested determination is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i), under which the court is to hold unlawful the final determination of Commerce if it is found to be unsupported by substantial evidence on the record or otherwise not in accordance with law. *See* 19 U.S.C.

§ 1516a(b)(1)(B)(i). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

> A. Plaintiff Has Not Established Its Right to a Remand Requiring a Calculation of the Profit Rate that Does Not Use the Third Country Sales Data of the Other Respondents

Although Thai I-Mei, during the investigation, presented various arguments under which it contended that Commerce acted contrary to law in using the third country sales data of the other respondents to calculate a constructed value profit rate, it has confined its Rule 56.2 motion to only three such arguments. Plaintiff first argues in its Rule 56.2 motion that Commerce's use of the other respondents' third country sales as the basis for constructed value profit was contrary to congressional intent under the relevant provision, 19 U.S.C. § 1677b(e)(2)(B). Second, plaintiff contends that Commerce's decision to use the third country sales of the other respondents is unsupported by judicial and administrative precedent. Third, plaintiff argues that Commerce's interpretation of the statute in the Amended Final Determination "runs counter to the international legal obligations of the United States." Pl.'s Br. 19. For the reasons discussed below, the court concludes that these arguments are meritless.

> 1. The Statute Does Not Prohibit, in All Calculations of Constructed Value Profit, Use of a Weighted Average of Profits Realized by Other Respondents in Third Country Sales

Plaintiff's first argument is one of statutory construction. According to this argument, 19 U.S.C. § 1677b(e)(2)(B) does not permit Commerce, when determining the constructed value of a foreign producer's merchandise, to calculate a constructed value profit rate that is based on the profits realized by other respondents in third country sales of the foreign like product. In the Amended Final Determination, Commerce construed the phrase "any other reasonable method"

contained in clause (iii) of 19 U.S.C. § 1677b(e)(2)(B) to allow it to do so. Commerce resorted to data on profits realized by Rubicon Group and Union Frozen Products in these respondents' sales of the foreign like product in Canada after it concluded that there was no viable home market for sales of the foreign like product, or of merchandise in the same general category of products as the subject merchandise, that was produced by Thai I-Mei or the other respondents. In a determination that plaintiff did not contest, either during the investigation or before the court, Commerce decided that it would not calculate a profit cap, concluding that it lacked data on the record by which it could do so. In the situation posed by the lack of data, Commerce construed clause (iii), when read together with the "facts available" provision of Section 776(a)(1) of the Act, 19 U.S.C. § 1677e(a)(1) (2000), which authorizes the use of "facts otherwise available" in reaching the applicable determination where "necessary information is not available on the record," to provide it with the authority to dispense with the calculation of a profit cap in the absence of any data on the record allowing a profit cap to be calculated. *See Decision Mem.* at 44-45.

Commerce's constructions of the statute it is charged with administering, when articulated by Commerce during its antidumping proceedings, are accorded deference consistent with the Supreme Court's decision in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1379-82 (Fed. Cir. 2001) (concluding that "statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under *Chevron*."); *cf. Crawfish Processors Alliance v. United States*, Appeal No. 06-1269 (Fed. Cir. Feb. 27, 2007) (declining to afford *Chevron* deference to, and rejecting, a construction of

19 U.S.C. § 1677(33) by Commerce that was held to be inconsistent with the unambiguous language of the statute). Under the two-step analysis of *Chevron,* the court first considers whether Congress has directly spoken to the precise issue in question. *Chevron U.S.A. Inc.*, 467 U.S. at 842-43 ("If the intent of Congress is clear, that is the end of the matter[.]"). "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In determining whether an agency's construction is permissible, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11. As required by *Chevron*, the court will grant deference to Commerce's construction of the statute under which the use of data from third country sales is not prohibited as a matter of law when constructed value profit is calculated under clause (iii). The court finds this construction to be reasonable. The court concludes that the contrary construction of the statute advocated by plaintiff is not a permissible construction.

Clause (iii) of § 1677b(e)(2)(B) does not expressly authorize Commerce to use profit data from third country sales of other respondents when calculating constructed value profit. Nor does it expressly prohibit this method. For these reasons, Congress, in enacting § 1677b(e)(2)(B), cannot be said to have directly spoken to the precise issue in question.

Although clause (ii) of § 1677b(e)(2)(B) contains a geographical restriction that is imposed by the inclusion of the term "foreign country," clause (iii) imposes no such general restriction and instead allows profit to be calculated by "any other reasonable method," subject to the specific restriction imposed by the aforementioned profit cap. *See* 19 U.S.C.

§ 1677b(e)(2)(B)(ii)-(iii). "When Congress includes particular language in one section of a statute but omits it in another section of the same Act, . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Clay v. United States*, 537 U.S. 522, 528 (2003) (internal quotation marks and citations omitted).

Plaintiff, however, contends that "when Commerce uses other respondents' sales as the basis for establishing a profit rate, Commerce can use *only* those sales made in their home markets, and not in any third country market." Pl.'s Br. 9. Plaintiff bases this argument on clause (ii) of § 1677b(e)(2)(B), which authorizes Commerce to calculate a profit rate based on the weighted average of the actual profits realized by other respondents, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country. Plaintiff views this "geographical restriction" to the home country market, expressed in clause (ii) of § 1677b(e)(2)(B) by the words "in the foreign country," as signifying congressional intent to prohibit Commerce from basing a profit rate on the third country sales of other respondents when calculating a profit rate under clause (iii). *Id.* at 11-12. Plaintiff argues that a construction of the statute permitting Commerce to rely on third country sales would "effectively nullify the clear limitation" of clause (ii) and render clause (ii) superfluous. *Id.* at 12. "Commerce *must* take into account the restrictions expressed in alternative (ii) when interpreting alternative (iii) in order to give full expression to Congressional intent." *Id.*

The court does not agree with plaintiff's statutory construction argument. Thai I-Mei's proffered construction of 19 U.S.C. § 1677b(e)(2)(B) errs by reading into clause (iii) a restriction that appears in clause (ii), not clause (iii), and by failing to give due effect to the presence in clause (iii) of the phrase "based on any other reasonable method" and to the specificity of the

language expressing the profit cap requirement. Because of these interpretive errors, plaintiff's construction does not comport with the plain meaning of the statute.

In § 1677b(e)(2)(B), Congress set forth, in clauses (i), (ii), and (iii), three separate methods under which Commerce may calculate profit when determining constructed value. *See* 19 U.S.C. § 1677b(e)(2)(B)(i)-(iii). The methods described under the three clauses are alternatives and are not hierarchical. *See Geum Poong Corp. v. United States*, 25 CIT 1089, 1091, 163 F. Supp. 2d 669, 673 (2001) (citing *SAA* at 840, *as reprinted in* 1994 U.S.C.C.A.N. at 4176) ("*Geum Poong I*"). The geographical restriction to the home country market that appears in clause (ii) does not appear in clause (iii) as a general restriction or qualification. *See id.* § 1677b(e)(2)(B)(ii)-(iii). Instead, clause (iii) authorizes Commerce to calculate constructed value profit "based on any other reasonable method," provided that the amount allowed for profit not exceed a specific amount determined as the "profit cap." *See id.* § 1677b(e)(2)(B)(iii). Within the larger context of § 1677b(e)(2)(B), clause (ii) sets forth a method for determining constructed value profit, but the inclusion of the other two clauses–clause (iii) in particular, with its reference to "any other reasonable method"–signifies that the particular requirements of the method of clause (ii) are not universal to all three methods. *See id.* § 1677b(e)(2)(B).

Because of the plain meaning of clause (iii), the court does not find convincing plaintiff's argument that Commerce's construction of the statute, which allows it to apply clause (iii) without adhering to a geographical restriction to the home market, effectively nullifies the geographical restriction within clause (ii) and renders clause (ii) superfluous. Contrary to the implication in plaintiff's argument, Commerce did not apply clause (iii) as a means to circumvent the geographical limitation contained in clause (ii). In the investigation at issue, Commerce used

the data of the other respondents in third country sales because it concluded that there were no usable home market sales data on the record of the investigation. Because of the limitations of that record, the method of clause (ii) was unavailable. Construing clause (iii) to permit, on that particular record, a method that would have been impermissible under clause (ii) does not, as a general matter, render superfluous clause (ii) or the geographical restriction contained therein.[4]

In arguing that Commerce always must adhere to the geographical restriction of clause (ii) when applying clause (iii), plaintiff fails to account for the effect of two express limitations specific to clause (iii). First, regardless of the record before Commerce, any method that Commerce chooses under clause (iii) to calculate a profit rate must be a "reasonable" method. Second, that method is subject to the profit cap limitation, to whatever extent that limitation applies given the facts of a particular investigation. In imposing these express limitations on the method, Congress specified the way that it intended to limit the discretion of Commerce in selecting a method. The statutory language does not reveal an intention to limit that discretion in other ways. Had Congress intended to include a geographical restriction among the limitations in clause (iii), it could have so provided. Congress did not do so, either expressly or impliedly.

---

[4] Plaintiff cites to various judicial precedents addressing the canon of statutory construction under which interpretations rendering meaningless or superfluous any portion of a statute are to be avoided. Pl.'s Br. 12-15. Because clause (ii) is not rendered meaningless or superfluous by Commerce's construction of clause (iii), plaintiff's citations to these precedents are unavailing.

#### 2. Plaintiff's Argument that Commerce's Method Is Unsupported by Judicial and Administrative Precedent Does Not Justify the Relief Plaintiff Seeks

Plaintiff next argues that in the Amended Final Determination "Commerce cited no judicial precedent, and only one administrative determination, to support its use of a profit rate based on other respondents' third country sales." Pl.'s Br. 17. The administrative determination to which plaintiff refers is *Fresh Atlantic Salmon from Chile*, to which Commerce cited in the Decision Memorandum, and in which Commerce used the weighted average of the profit rates of the other four Chilean producers on sales of the foreign like product in their respective comparison markets, in calculating a constructed value profit rate for a respondent that had no viable home or third country markets for the foreign like product. *See Notice of Final Determination of Sales at Less Than Fair Value: Fresh Atlantic Salmon from Chile*, 63 Fed. Reg. 31,411, 31,435 (June 9, 1998). Plaintiff acknowledges that "the specific issue in this case has not previously been addressed by this Court" but argues that "precedent from this Court suggests that Commerce's position in the Amended Final Determination (and, by implication, its conclusion in *Fresh Atlantic Salmon from Chile* as well) is unsustainable." Pl.'s Br. 17-18 (footnote omitted). To support this contention, plaintiff cites the series of cases in the Court of International Trade consisting of *Geum Poong I*, 25 CIT 1089, 163 F. Supp. 2d 669; *Geum Poong Corp. v. United States*, 26 CIT 322, 193 F. Supp. 2d 1363 (2002) ("*Geum Poong II*"); and *Geum Poong Corp. v. United States*, 26 CIT 991 (2002) ("*Geum Poong III*").

The mere absence of an existing judicial decision affirming the method Commerce used in the investigation to calculate Thai I-Mei's constructed value profit rate does not, of course, require the court to rule in plaintiff's favor. Nor does Commerce's having employed a similar

method only once before, in *Fresh Atlantic Salmon from Chile*, demonstrate that the method

Commerce used in this case is unsupportable.  In conceding that the specific issue in this case has

not previously been addressed by the Court of International Trade, plaintiff impliedly

acknowledges that the *Geum Poong* series of cases involved different issues than those posed

here.  The only genuine question raised by plaintiff's argument relating to judicial and

administrative precedent, therefore, is whether the *Geum Poong* series of cases nevertheless

"suggests" that the method Commerce used to calculate Thai I-Mei's constructed value profit

rate was contrary to law.  The court does not find such a suggestion in the *Geum Poong* cases.

The *Geum Poong* cases arose from an antidumping investigation of imports of certain

polyester staple fiber from Korea.  Commerce was faced with calculating a constructed value

profit rate under alternative (iii), *i.e.*, clause (iii) of § 1677b(e)(2)(B), for respondent Geum

Poong, which had no viable home market for comparison with sales in the United States.  *Geum*

*Poong I*, 25 CIT at 1089-90, 163 F. Supp. 2d at 672.  Another respondent in the investigation,

Sam Young Synthetics Co., Ltd. ("Sam Young"), also lacked viable home market sales.  *See*

25 CIT at 1089, 1091, 163 F. Supp. 2d at 671, 674.  A third respondent, Samyang Corporation

("Samyang") had a viable home market for the foreign like product, but Commerce determined

that it could not base Geum Poong's constructed value profit solely on Samyang's sales

according to the method of clause (ii), because doing so would reveal to the public Samyang's

proprietary profit ratio, in violation of Commerce's own regulations protecting proprietary

business information.  25 CIT at 1090-92, 163 F. Supp. 2d at 674.  Commerce calculated a figure

for the weighted average profit rates of Sam Young and Samyang and then calculated a simple

average of that figure and the country-wide profit ratio for the Korean man-made fibers industry,

obtained from a publication of the Bank of Korea ("BOK").  25 CIT at 1090, 1092,

163 F. Supp. 2d at 673-75.  Commerce proceeded under "facts available" according to Section

776(a)(1) of the Act, 19 U.S.C. § 1677e(a)(1).  25 CIT at 1096, 163 F. Supp. 2d at 678; *See*

19 U.S.C. § 1677e(a)(1).

The Court of International Trade, noting issues regarding the calculation of the profit rate

and the decision of Commerce not to calculate a profit cap, rejected the calculation of Geum

Poong's constructed value profit ratio that Commerce performed under clause (iii).

25 CIT at 1096-98, 163 F. Supp. 2d at 679-80.  Identifying various shortcomings in Commerce's

calculation of Geum Poong's constructed value profit rate, the Court concluded in *Geum Poong I*

that Commerce had failed to explain the reasonableness of the method it undertook under

clause (iii).  *Id.*  Specifically, the Court noted, Commerce failed to address the adequacy of data

in certain financial statements for Samyang and two other Korean producers of polyester staple

fiber, Saehan Industries, Inc. ("Saehan") and SK Chemicals Co., Ltd. ("SK Chemicals"), failed to

explain whether any other data were available to calculate a profit cap, and failed to explain why

it dispensed with a profit cap calculation entirely.  25 CIT at 1096-97, 1097 n.14, 163 F. Supp. 2d

678-79 & n.14.  The Court noted that "[i]f Alternative Three [*i.e.*, clause (iii) of

§ 1677b(e)(2)(B)] without the profit cap may be used as 'facts available,' it would seem a 'facts

available' profit cap may also be used."  25 CIT at 1097, 163 F. Supp. 2d at 679.  The Court

added that "[b]ecause the statute mandates the application of a profit cap, Commerce cannot

sidestep the requirement without giving adequate explanation even in a facts available scenario.

Such an omission prevents any meaningful review of Commerce's determination."  *Id.*

On remand from *Geum Poong I*, Commerce did not recalculate Geum Poong's

constructed value profit.  *Geum Poong II*, 26 CIT at 322-23, 193 F. Supp. 2d at 1364-65.  It

stated in its remand redetermination that, other than the Samyang profit data, all of the profit data

on the record were unsuitable for use in calculating a profit cap because those data included, or

were likely to include, profits earned on sales outside of Korea.  26 CIT at 323, 193 F. Supp. 2d

at 1366.  The Court in *Geum Poong II* concluded that Commerce had ignored the Court's

specific instruction to apply a "facts available profit cap" if a reasonable means of calculating one

could be devised.  26 CIT at 324, 193 F. Supp. 2d at 1366.  The Court disagreed with the

decision by Commerce to reject profit data that may include non-home market sales when

attempting to calculate a facts available profit cap.  26 CIT at 324, 193 F. Supp. 2d at 1366-67.

Referring to the first remand redetermination, the Court in *Geum Poong II* stated that

> [i]n this case, Commerce did not determine that any of the data sources were
> predominantly or exclusively non-home market sales.  Nor did Commerce assess
> the relative validity among the sources in light of their deficiencies.  Therefore,
> Commerce did not fulfil its obligation to determine whether a reasonable "facts
> available profit cap" could be applied, and has not presented sufficient grounds for
> dispensing with the profit cap altogether.

26 CIT at 324, 193 F. Supp. 2d at 1367.  The Court also concluded that Commerce again failed

to provide a valid reason why the data in financial statements of three Korean producers of

polyester staple fiber (Samyang, Saehan, and SK Chemicals) would be unrepresentative of profit

in Geum Poong's home market sales and therefore unsuitable for use in calculating a constructed

value profit rate.  26 CIT at 325-26, 193 F. Supp. 2d at 1367-69.

In its second remand redetermination, Commerce calculated, under clause (iii), a facts

available profit rate for Geum Poong based on a simple average of the profit rates of Saehan and

SK Chemicals, which the Court in *Geum Poong III* upheld.[5]  *Geum Poong III*, 26 CIT at 993-94, 1002.  Commerce did not include data from Samyang's financial statement in calculating the simple average because it concluded that "'50.6% of the company's sales are to export markets'" and therefore "'Samyang's sales are predominantly non-home market sales.'"  *Id*. at 993 (quoting Commerce's second remand redetermination).  Commerce lacked corresponding or similar information on the geographical distribution of the sales by Saehan and SK Chemicals.  *Id.* at 998.  In this regard, the Court in *Geum Poong III* observed that "Commerce conceded that '[l]acking information about the geographical distribution of Saehan's and SK Chemicals' sales, we cannot determine that their sales are predominantly non-home market sales.'"  *Id*. at 998 (quoting Commerce's second remand redetermination).  The Court concluded that the simple average of the profit rates of Saehan and SK Chemicals "satisfies the cap language of the statute."  *Id.* at 993-94.  In affirming the results of the second remand redetermination, the Court summarized its conclusions by stating that

> in the absence of any indication that the data for Saehan or SK Chemicals were "overly compromised" by non-home market sales or other problems, in light of evidence that both companies produced products similar to the subject merchandise in the reasonably contemporaneous period, and in the absence of better choices, Commerce's determination to use data from these companies as "facts available" is reasonable and supported by substantial evidence.

*Id*. at 999.

---

[5] Because of the use of the recalculated profit rate, Geum Poong's antidumping duty rate was revised downward to 0.12 percent, a *de minimis* rate that resulted in revocation of the antidumping duty order as to Geum Poong.  *Geum Poong III*, 26 CIT at 994.

In arguing that the *Geum Poong* series of cases suggests that Commerce may not use a profit rate based on other respondents' third country sales, plaintiff directs the court's attention to the following passage from *Geum Poong III*:

> Nevertheless, the reason for rejecting the methodology under Alternative Two applies to Alternative Three, as well. A calculation of *the profit rate **or** the profit cap* under Alternative Three using facts available lacks Alternative Two's prohibition on use of non-home market profit data, yet the geographical distribution of sales is still a factor in analyzing whether to use a particular data source. In this case, [respondent] Sam Young's known lack of home market sales would be sufficient grounds for rejecting its profit data under Alternative Three, regardless of the similarity of its products to Geum Poong's . . . *In this case, Commerce knew for a fact that Sam Young lacked any home-market sales, and thus rejection of its data was warranted in calculating CV profit under any Alternative.*

Pl.'s Reply Br. 6-7 (quoting *Geum Poong III*, 26 CIT at 1000). Plaintiff argues in its reply brief that "[a]ny fair reader of this passage would have to conclude that the Court was addressing the inappropriateness of using a respondent's third country sales for the calculation of *either* the profit rate or the profit cap under alternative (iii)." *Id.* at 7. Plaintiff's argument reads too much into the passage, which does not construe alternative (iii) to disallow Commerce, on any record and any findings of fact, from calculating constructed value profit exclusively from data on third country sales. The passage itself identifies the geographical distribution of sales as "a factor in analyzing whether to use a particular data source." *Geum Poong III*, 26 CIT at 1000. It does not state that geographical distribution is the only factor. Nor does it imply that a case could not exist in which no data source is suitable for use in calculating a profit cap or a "facts available" profit cap; such a situation was not presented by the *Geum Poong* cases. The Court stated elsewhere in *Geum Poong III* that "[a]s it recognized in the second remand determination, Commerce clearly was permitted by the court to dispense with the profit cap if available data

would render the profit cap unreasonable or inaccurate." *Id.* at 999 (internal quotation marks and citation omitted).

In summary, the court finds nothing in the *Geum Poong* series of cases that holds or suggests that Commerce, as a matter of law, is never permitted to base the constructed value profit rate of a respondent on the third country sales of other respondents when applying clause (iii). The court, accordingly, is unable to agree with plaintiff's argument that, based on the *Geum Poong* cases, "precedent from this Court suggests that Commerce's position in the Amended Final Determination (and, by implication, its conclusion in *Fresh Atlantic Salmon from Chile* as well) is unsustainable." Pl.'s Br. 17-18.

### 3.  Commerce's Interpretation of Clause (iii) of 19 U.S.C. § 1677b(e)(2)(B) Does Not Run Counter to the International Obligations of the United States

Plaintiff's third argument is that Commerce's interpretation of clause (iii) of 19 U.S.C. § 1677b(e)(2)(B) in the Amended Final Determination is "contrary to the international legal obligations of the United States" because it "vitiates the restriction contained in Article 2.2.2(ii) [of the Antidumping Agreement.]" *Id.* at 19, 21 (citing Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1A, *in* World Trade Organization, The Results of the Uruguay Round of Multilateral Trade Negotiations, The Legal Texts 147 (1999) ("Antidumping Agreement"). This argument has essentially the same shortcoming as plaintiff's general statutory construction argument.

The statute, 19 U.S.C. § 1677b(e)(2)(B), closely parallels Article 2.2.2 of the Antidumping Agreement which contains, in Article 2.2.2(ii), the geographical restriction on

which plaintiff relies. Plaintiff, however, cites to nothing in Article 2.2.2 or elsewhere in the Antidumping Agreement requiring or suggesting the interpretation it advances. Nor does plaintiff cite to anything in the legislative history of the implementing legislation that indicates a congressional intent to construe the Antidumping Agreement such that the geographical restriction of clause (ii) of 19 U.S.C. § 1677b(e)(2)(B) is to apply generally to calculations of constructed value profit made under clause (iii) thereof. Moreover, plaintiff points to nothing in the Antidumping Agreement precluding an administering authority from basing a decision to use data on profits realized by other respondents in third country sales in the absence of suitable home market data. For these reasons, the court does not find merit in plaintiff's argument that Commerce's interpretation of clause (iii) is contrary to the international legal obligations of the United States.

### B. Commerce's Choice of the Data of Other Respondents over the TFFA Data Was Reasonable on the Record of the Investigation and Supported by Substantial Evidence

In its case brief to Commerce dated October 27, 2004, Thai I-Mei contested the reasonableness of Commerce's use of respondents' third country sales as the basis for calculating the constructed value profit rate and advocated for the use of the TFFA data it had submitted. App. to Def.'s Mem. Ex. 6 at 2-10. Specifically, Thai I-Mei argued that its own proposed method of calculating constructed value profit was reasonable because it "includes the TFFA members' profit experience on their sales in Thailand[,]" whereas the method Commerce used was not reasonable because it was based entirely on data from third country sales. *Id*. Ex. 6 at 5, 8. Plaintiff does not make this specific argument in its briefs supporting its Rule 56.2 motion, although it characterizes the contested determination generally as unreasonable and unsupported

by substantial evidence.  Pl.'s Br. 8.  Instead, plaintiff's brief supporting its Rule 56.2 motion challenges the use of the third country sales data based on the three arguments discussed in the preceding sections, each of which is distinguishable from the "reasonableness" argument presented in plaintiff's October 2004 brief to Commerce, and each of which, for the reasons also discussed in the preceding sections, the court finds unconvincing.

Under Rule 56.2, a movant's briefs supporting its motion for judgment on the agency record must identify the specific reasons why the contested determination is unsupported by substantial evidence on the record or is otherwise not in accordance with law.  *See* USCIT R. 56.2(c)(1)(B).  Because the above-described "reasonableness" argument is not included in plaintiff's briefs in support of its motion, the court, as a procedural matter, may regard that argument as not before it.

However, even if the court were to infer the "reasonableness" argument from a liberal interpretation of the various points plaintiff makes in its brief supporting its Rule 56.2 motion, and thus consider this argument on the merits, such an inference would not entitle plaintiff to the broader relief sought in the Rule 56.2 motion, *i.e.*, a remand requiring Commerce to recalculate Thai I-Mei's constructed value profit rate according to an entirely different set of data.  The court reaches this conclusion based on a review of Commerce's comparison of the data that Commerce used in its calculation and the data that Thai I-Mei placed on the record.  As discussed *infra*, Commerce supported with substantial evidence on the record its decision to reject the TFFA data submitted by Thai I-Mei in favor of the sales data of the two other respondents and explained adequately its reasons for doing so in the Decision Memorandum.

There is a strong preference expressed in § 1677b(e)(2)(B)(i)-(iii) for the calculation of constructed value profit using data on sales in the home country market. Clause (i) bases this calculation on sales in the home market by the respondent being examined that involve "merchandise that is in the same general category of products as the subject merchandise[.]" 19 U.S.C. § 1677b(e)(2)(B)(i). Clause (ii) entails calculation of the weighted average of profits realized by other respondents on sales of the foreign like product in the home market. *Id.* § 1677b(e)(2)(B)(ii). Clause (iii) does not generally prohibit the determination of constructed value profit according to sales in third country markets, but the profit cap is calculated according to the amount normally realized by exporters and producers in home market sales of "merchandise that is in the same general category of products as the subject merchandise[.]" *Id.* § 1677b(e)(2)(B)(iii). As stated in *Geum Poong II*, "the goal in calculating CV profit is to approximate the home market profit experience." *Geum Poong II*, 26 CIT at 327, 193 F. Supp. 2d at 1370.

While the statute expresses a strong preference for the use of home market profit data, it allows, in clause (iii), for the use of reasonable methods that are not based on home market sales. As recognized by the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, situations may exist in which Commerce, due to the absence of data, is unable to use clauses (i) and (ii) and also is unable to calculate a profit cap. *See SAA* at 841, *as reprinted in* 1994 U.S.C.C.A.N. at 4177. The Statement of Administrative Action states that

> [t]he Administration also recognizes that where, due to the absence of data, Commerce cannot determine amounts for profit under alternatives (1) and (2) or a "profit cap" under alternative (3), it might have to apply alternative (3) on the basis of "the facts available." This ensures that Commerce can use alternative

(3) when it cannot calculate the profit normally realized by other companies on sales of the same general category of products.

*Id.*

In comparing the TFFA data to the data on the other respondents' sales in Canada, Commerce cited its practice of applying various factors, including the similarity of the potential surrogate companies' business operations and products to those of the respondent, the extent to which the surrogate data reflects sales in the United States as well as in the home market, contemporaneity of the data with the period of investigation, and the similarity of the customer base. *Decision Mem.* at 45. Commerce concluded that calculating Thai I-Mei's constructed value profit rate using the data from sales in Canada by Rubicon Group and Union Frozen Products was reasonable under clause (iii) because of the similarity of the products sold in Canada by the other respondents to those sold by Thai I-Mei, *i.e.*, frozen, head-off, cooked and uncooked shrimp, because the data on the sales in Canada excluded sales in the United States, because the data on the sales in Canada were contemporaneous with the period of investigation, and because of the similarity of the customer base. *Id.* at 45.

In the Decision Memorandum, Commerce set forth the reasons for its finding that the TFFA data submitted by Thai I-Mei are inadequate by comparison: (1) plaintiff did not demonstrate that the business operations and product mix of the companies included in the TFFA data were more similar to its own than that of Rubicon Group and Union Frozen Product Co.; (2) the TFFA data included sales to the United States; (3) plaintiff's method was less contemporaneous with the period of investigation than Commerce's method; and (4) plaintiff did not provide any information to demonstrate that the customer bases of the surrogate companies

were similar to its own customer base. *Id*. at 45-46. Thai I-Mei contended that the TFFA data were superior to the other respondents' data because they included the TFFA members' profit experience on their sales in Thailand. *Id*. at 46. Commerce responded that "[a]s both parties previously observed, given the unique facts of this investigation, there is a non-existent or insignificant home market for frozen and canned warmwater shrimp." *Id.* Commerce found "that the insignificant amount of the home market sales included in Thai I-Mei's CV profit calculation does not represent the true home market profit rate." *Id.*

Substantial evidence on the record supports Commerce's findings pertaining to the superiority of the data derived from the other respondents' sales in Canada over the TFFA data. In particular, the record reveals that the TFFA data were derived from data that included sales in the United States that were not insignificant and sales of products that were less similar to Thai I-Mei's merchandise than that of Rubicon Group and Union Frozen Products. *See* App. to Def.'s Mem. Ex. 3 at 5, 8, Ex. 5 at 3-7. Plaintiff did not dispute, either in its case brief filed with Commerce or in its Rule 56.2 motion before the court, that the data on the Canadian sales of the other respondents were superior to the TFFA data under the factors Commerce applied, *other than* the geographical factor. Instead, plaintiff argued–in its case brief to Commerce but not in its memorandum supporting its Rule 56.2 motion before the court–that the TFFA data were superior to the other respondents' sales data because the former included at least some, albeit limited, data on home market sales. *Id.* Ex. 6 at 5-6 ("Thai I-Mei's methodology at least encompasses *some* sales of shrimp and other merchandise in the same general category of products made in Thailand.").

The record establishes that practically all of the sales–of any product–represented by the TFFA data that Thai I-Mei submitted during the investigation were sales in third countries, including the United States. *See Decision Mem.* at 45-46. During the investigation, plaintiff itself acknowledged the absence of a meaningful relationship to the Thai market when it submitted the TFFA data during the investigation. "The sales being used as the basis for the CV profit rate proposed by Thai I-Mei were largely, if not exclusively, export sales." App. to Def.'s Mem. Ex. 3 at 7. Commerce's finding that Thai I-Mei did not place on the record of the investigation data that were materially superior to the data pertaining to sales in Canada by the other respondents, with respect to the relationship of those sales data to the home market, was supported by substantial evidence. Had plaintiff obtained and submitted such superior data, it may have placed itself in a position to argue, in the investigation and in this judicial review proceeding, that any rejection of such data by Commerce would have been unreasonable generally under clause (iii) of 19 U.S.C. § 1677b(e)(2)(B) or, specifically, inconsistent with the obligation imposed by clause (iii) to calculate and apply a profit cap (or a "facts available" profit cap) where it is possible to do so.[6]

"[T]he burden of creating an adequate record lies with respondents and not with Commerce." *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 936, 806 F. Supp.

---

[6] Whether an alternate data set could have been submitted can be, in hindsight, only a matter of speculation. However, clause (iii) allows considerable flexibility in directing calculation of a profit cap according to data on sales in the home market of "merchandise that is in the same *general category* of products as the subject merchandise[.]" 19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added). Additional flexibility is provided by the principle of the "facts available" profit cap as discussed in the *Geum Poong* cases. *See*, *e.g.*, *Geum Poong II*, 26 CIT at 323-24, 193 F. Supp. 2d at 1365-67. These principles could have guided the search for a data set from which calculation of a profit cap or a facts available profit cap would have been possible.

1008, 1015 (1992) (citing *Chinsung Indus. Co. v. United States*, 13 CIT 103, 705 F. Supp. 598 (1989)). Nonetheless, the review process is "bilateral and interactive" and must afford a party the "reasonable opportunity" to meet its burden. *Böwe-Passat v. United States*, 17 CIT 335 (1993). Here, plaintiff took advantage of the opportunity to present data to Commerce and to advocate the use of those data to calculate a constructed value profit rate. The data plaintiff presented, however, when compared to the data pertaining to the third country sales of Rubicon Group and Union Frozen Products, were not superior in any material respect and, in several respects, were inferior.

The TFFA profit-related data and related submissions to the record by Thai I-Mei do not reveal the overall percentage of the underlying TFFA sales that occurred in the home market. Nevertheless, the available data confirms that home market sales represented a very small percentage of the submitted profit-related data. Thai I-Mei emphasized in its case brief to Commerce that one of the TFFA companies "made 3.87% and 3.91% of its sales in Thailand during 2002 and 2003, respectively" and that another "made 1.62% and 2.47% of its sales in Thailand during 2002 and 2003, respectively." App. to Def.'s Mem. Ex. 6 at 6 n.19. Defendant points to two other companies described in the TFFA data submitted by plaintiff, which two companies exported 98 percent and 99 percent of their products, and also points to a third company, which derived 100 percent of its revenue from export sales. Def's Suppl. Br. in Resp. to the Ct.'s Dec. 30, 2005 Ltr. at 16 (citing various submissions made by Thai I-Mei during the investigation). The record evidence does not appear to allow for isolation of the TFFA data that pertain to home market sales, and Thai-I Mei's proposed profit calculation did not show that such isolation was possible. Plaintiff's argument in its case brief to Commerce, that the TFFA data

are more closely related to the home market than are the Rubicon Group and Union Frozen

Products data, is unpersuasive for these reasons.

In summary, plaintiff's case faces serious difficulties in challenging the selection by

Commerce of the data on third country sales by Rubicon Group and Union Frozen Products over

the TFFA data. As discussed above, plaintiff did not support its Rule 56.2 motion with the

specific argument that it made before Commerce. *Id.* Ex. 6 at 2-10. Moreover, for the reasons

discussed above, Commerce's choice of the Rubicon Group and Union Frozen Products data

over the TFFA data was based on findings that were supported by substantial evidence on the

record.

C.  Plaintiff Did Not Exhaust Its Administrative Remedies to Enable It to Contest the Failure of
     Commerce to Obtain Data for Use in Calculating a Profit Cap or a Facts Available Profit Cap

Commerce was unable to calculate a profit cap or a "facts available" profit cap based on

Rubicon Group and Union Frozen Products data because those data bore no relationship to the

home market. The TFFA data set placed on the record by plaintiff was based on a relatively

insignificant level of home market sales. Because the TFFA data were derived almost

exclusively from export sales, and because the data pertaining to the two other respondents,

Rubicon Group and Union Frozen Products, pertained exclusively to third country markets, the

finding by Commerce, as stated in the Decision Memorandum, that the record information did

not allow it to calculate a profit cap under clause (iii) is supported by substantial evidence.

*Decision Mem.* at 45. A profit cap must be calculated using profit data from sales in the home

market of merchandise in the same general category of products as the subject merchandise.

19 U.S.C. § 1677b(e)(2)(B)(iii). Even if considered to be derived exclusively from sales of

merchandise in the same general category of products as the subject shrimp, the TFFA data still would be unusable for calculation of a profit cap. Because the TFFA data bear only the slightest relationship to the home market, they would not qualify for use even as a "facts available" profit cap under an analysis of the kind found acceptable and affirmed upon remand in *Geum Poong III*. *See Geum Poong III*, 26 CIT at 998-99, 1002.

In concluding that substantial evidence supported Commerce's finding that the record did not allow calculation of a profit cap, the court does not imply that the method by which Commerce applied § 1677b(e)(2)(B)(iii) in conducting its investigation was consistent with law in all respects. To the contrary, the manner in which Commerce conducted the investigation is open to serious question because of Commerce's apparent failure to give sufficient attention to the profit cap obligation contained within clause (iii). Although the inadequacy of the record for calculating a profit cap, for the reasons discussed above, is largely the result of plaintiff's failure to place better data on the record, the court is unable to conclude that Commerce adequately discharged its statutory responsibility with respect to the profit cap requirement. The court is unable to conclude that Commerce made adequate attempts to obtain data from which it could have calculated a profit cap, *i.e.*, "the amount normally realized by exporters or producers . . . in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise." 19 U.S.C. § 1677b(e)(2)(B)(iii).

The court's specific concern is that Commerce's inquiry may have been too narrow. The court's concern is heightened by the following passage in the Decision Memorandum:

> Pursuant to alternative (iii), the Department has the option of using any other reasonable method, as long as the result is not greater than the amount realized by exporters or producers "in connection with the sale, for consumption in the

foreign country, of merchandise that is in the same general category of products as the subject merchandise" (*i.e.*, the "profit cap"). We were unable to calculate the profit cap because it is required to be based on profit in the home market and the Rubicon Group's and UFP's profit are based on the third country market, nor is there any evidence on the record that demonstrates that there is a market for *subject merchandise* in Thailand.

*Decision Mem.* at 45 (emphasis added). The reference to "subject merchandise" at the end of the quoted passage could support an inference that Commerce neglected even to consider the possibility of obtaining data on profits realized by exporters or producers in connection with sales in Thailand of merchandise that is in the same general category of products as the subject merchandise.

Nevertheless, the court concludes that plaintiff has not met its burden of qualifying for a remand under which Commerce must calculate a profit cap or a facts available profit cap. To obtain that form of relief, plaintiff would have needed to exhaust its administrative remedies. *See* 28 U.S.C. § 2637(d) (2000) (requiring exhaustion of administrative remedies "where appropriate"). As discussed above, plaintiff did not place data on the record under which a profit cap or a facts available profit cap could have been calculated. The record also reveals that plaintiff, during the investigation by Commerce, did not raise the general issue of whether calculation of a profit cap or a facts available profit cap was required or appropriate. Nor did plaintiff raise this issue in the brief supporting the Rule 56.2 motion that is before the court.

The exhaustion requirement mandates that "'courts should not topple over administrative decisions unless the administrative body not only has erred, *but has erred against objection made at the time appropriate under its practice.*'" *Woodford v. Ngo*, 126 S. Ct. 2378, 2385 (2006) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)). This "requires

proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly*.'" *Id.* at 2380-81 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)).

The exhaustion doctrine serves two basic purposes. "It allows the administrative agency to perform the functions within its area of special competence (to develop the factual record and to apply its expertise), and–at the same time–promotes judicial efficiency and conserves judicial resources, by affording the agency the opportunity to rectify its own mistakes (and thus to moot controversy and obviate the need for judicial intervention)." *Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 28 CIT ___, 342 F. Supp. 2d 1191, 1206 (2004) (citing *Parisi v. Davidson*, 405 U.S. 34, 37 (1972) and *Richey v. United States*, 322 F.3d 1317, 1326 (Fed. Cir. 2003) (stating that exhaustion serves "the twin purposes . . . of protecting administrative agency authority and promoting judicial efficiency")). Because plaintiff did not raise the profit cap issue before the agency, Commerce was not put on timely notice of plaintiff's objection. Had plaintiff raised the issue according to the procedures Commerce has established for doing so, Commerce may have conducted the investigation differently. In an antidumping case, where "'Congress has prescribed a clear, step-by-step process for a claimant to follow, . . . the failure to do so precludes [the claimant] from obtaining review of that issue in the Court of International Trade.'" *Id.* (quoting *JCM. Ltd. v. United States*, 210 F.3d 1357, 1359 (Fed. Cir. 2000)).

Although waiver of the exhaustion obligation is sometimes appropriate, waiver is not appropriate in this case. Waiver of the exhaustion requirement has been recognized as appropriate when (1) plaintiff's argument involves a pure question of law; (2) there is a lack of timely access to the confidential record; (3) a judicial decision rendered subsequent to the

administrative determination materially affected the issue; or (4) raising the issue at the administrative level would have been futile. *See generally Budd Co. Wheel & Brake Div. v. United States,* 15 CIT 446, 452 n.2, 773 F. Supp. 1549, 1555 n.2 (1991). None of these exceptions is applicable here.

This case does not meet the requirements of the "legal question" exception to the exhaustion requirement. To qualify for this exception, plaintiff must raise a new argument, this argument must be of purely legal nature, the inquiry must require neither further agency involvement nor additional fact finding or opening up the record, and the inquiry must neither create undue delay nor cause expenditure of scarce party time and resources. *Corus Staal BV v. United States*, 30 CIT ___, ___ n.11, Slip Op. 06-112 at 17 n.11 (July 25, 2006) (citing *Consol. Bearings Co. v. United States*, 25 CIT 546, 587 (2001)). Plaintiff did not raise the profit cap issue in connection with its Rule 56.2 motion. Even had the argument been raised and even were it considered to be of purely a legal nature, it would require reopening of the record and expenditure of agency resources to obtain a new set of data and a calculation of the profit cap or facts available profit cap according to those data. The second and third exceptions to exhaustion–lack of access to the confidential record and a subsequent judicial determination–do not arise in the context of this case. Finally, the court has no basis to conclude that Commerce would have rejected the "profit cap" argument had it been made. Accordingly, the court cannot conclude that plaintiff's raising of the issue before the agency would have been futile. *See Carpenter Tech. Corp. v. United States*, 30 CIT __, __, Slip Op. 06-134 at 4 (Sept. 6, 2006) (declining to waive the obligation to exhaust administrative remedies for futility where plaintiff

did not object to "collapsing" during the administrative review at issue and where Commerce had

rejected plaintiff's objections to collapsing in previous administrative reviews).

### D.  Commerce Failed to Provide an Adequate Explanation of Its Decision to Exclude Sales of the Other Two Respondents that Were Outside of the Ordinary Course of Trade

In addition to challenging the use of respondents' third country sales, plaintiff challenges

Commerce's decision to calculate Thai I-Mei's profit rate based only on those sales of the other

respondents that occurred in the ordinary course of trade.  The term "ordinary course of trade" is

defined in the Tariff Act as

> [t]he conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind.  The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:
>
> (A) Sales disregarded under section 1677b(b)(1) of this title [which section refers to below-cost sales].
> (B) Transactions disregarded under section 1677b(f)(2) of this title [which section refers to certain transactions between affiliated parties].

19 U.S.C. § 1677(15).  Plaintiff does not dispute that respondents Rubicon Group and Union

Frozen Products made sales in Canada at below cost and at prices that would not permit recovery

of all costs within a reasonable period of time.  However, plaintiff argues that the exclusion by

Commerce of these sales outside the ordinary course of trade is unreasonable because the

exclusion is unsupported by facts unique to this investigation.  Pl.'s Br. 24-27.

In the Decision Memorandum, Commerce provided only a brief explanation for confining

its calculation to sales made in the ordinary course of trade.  Commerce began by stating that

Section 773(e)(2)(B)(iii) of the Act (19 U.S.C. § 1677b(e)(2)(B)(iii)) neither precludes it from

using sales made in the ordinary course of trade nor requires it to use sales outside the ordinary

course.  *Decision Mem.* at 46.  According to the Decision Memorandum, "each case should be evaluated based on the facts."  *Id.*  However, Commerce did not identify in the Decision Memorandum specific factual findings sufficient to characterize this case as one in which sales outside the ordinary course should be excluded.  *See id.*  The only finding of fact Commerce cited in the Decision Memorandum was its finding that "other respondents made third country sales in the ordinary course of trade" to distinguish this case from others, such as *Certain Pasta from Italy,* where there were no sales made in the ordinary course of trade.  *Id.* (citing *Notice of Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review: Certain Pasta from Italy,* 64 Fed. Reg. 43,152, 43,155 (Aug. 9, 1999)).

The preamble to Commerce's regulations promulgating 19 C.F.R. § 351.405, which addresses the calculation of normal value based on constructed value and, specifically, the computation of profit for constructed value, addresses the issue of data on sales outside of the ordinary course of trade.  *Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. 27,296, 27,358-59 (May 19, 1997) ("*Final Rule*").  According to the preamble, Commerce believes that in computing profit for constructed value, "the automatic exclusion of below-cost sales would be contrary to the statute."  *Id.*  Commerce then explained that in the preferred and second alternative methods for computing profit, the statute allows for the exclusion of sales outside the ordinary course of trade.  *Id.*  It noted, however, that the first and third alternative methods for calculating profit did not contain this same exclusion:

> With respect to the other alternative profit methods authorized by section 773(e)(2)(B), the Department believes that the absence of any ordinary course of trade restrictions under the first alternative is a clear indication that the Department normally should calculate profit under this method on the basis of all home market sales, without regard to whether such sales were made at below-cost

> prices. However, the same cannot be said of the third alternative method, which provides for the use of "any other reasonable method" in determining CV profit. The SAA at 841 makes it clear that, given the absence of any comparable standard under the prior statute, it would be inappropriate to establish methods and benchmarks for applying this alternative. Thus, *depending on the circumstances and the availability of data, there may be instances* in which the Department would consider it necessary to exclude certain home market sales that are outside the ordinary course of trade in order to compute a reasonable measure of profit for CV under the third alternative method.

*Id.* (emphasis added). In this investigation, data were available allowing Commerce to exclude sales outside the ordinary course of trade. However, the Decision Memorandum does not identify what evidence of record in this investigation constituted appropriate "circumstances."

In the Decision Memorandum, Commerce cited Section 773(e)(2)(A) of the Act, the provision that provides for the ordinary constructed value calculation of selling, general, and administrative expenses, and profits, of the respondent. *Decision Mem.* at 46; *see* 19 U.S.C. § 1677b(e)(2)(A). This citation, standing alone, sheds no light on reasoning supporting the contested decision. Commerce also cited in the Decision Memorandum its regulation codified at 19 C.F.R. § 351.405(b)(1). *Decision Mem.* at 46. This citation appears to be an inadvertent error; the cited regulation, which defines the term "foreign country" for purposes of Section 773(e)(2)(A) of the Act, is irrelevant to the issue under consideration. Commerce included in the Decision Memorandum the conclusory statement that "including only the sales made in the ordinary course of trade is consistent with the Department's preferred methodology of calculating profit." *Id.* at 46. This statement is not consistent with the policy announced in the preamble to its own regulations, which contemplates a case-by-case approach. *See Final Rule*, 62 Fed. Reg. at 27,358-59.

In its brief opposing plaintiff's Rule 56.2 motion, Commerce provides additional explanations, including the explanation that "exclusion of below-cost sales was consistent with the statutory preference for basing profit upon above-cost sales," Def.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. at 34, and that the lack of ordinary course of trade language in clause (iii) exists because it would be "impractical" to require Commerce to use only sales in the ordinary course of trade in all cases, *id.* at 37. These explanations can be only *post hoc* justifications, upon which a court may not sustain an agency action. *See SEC v. Chenery, Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.").

When Commerce applies alternative (iii), it is obligated to "'provide to interested parties a description of the method chosen and an explanation of why it was selected.'" *Geum Poong II*, 26 CIT at 323 n.2, 193 F. Supp. 2d at 1365 n.2 (quoting *SAA* at 840, *as reprinted in* 1994 U.S.C.C.A.N. at 4176). Commerce failed to comply with this directive, because in failing to inform plaintiff of the reasons for its decision to exclude sales outside the ordinary course of trade, Commerce did not provide plaintiff with a reasoned explanation why it chose a method limited to sales in the ordinary course.

In implementing the antidumping statute, Commerce is to calculate antidumping margins as accurately as possible. *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994); *Geum Poong I*, 25 CIT at 1098, 163 F. Supp. 2d at 679 (quoting *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995)). To ensure compliance with this purpose, Commerce is directed to make case-by-case determinations and consider data unique to

the particular case before it, rather than summarily exclude below-cost sales on the reasoning that such exclusion is consistent with a vague policy preference. *See Final Rule*, 62 Fed. Reg. at 27,358-59. Commerce's failure to support its decision by explaining its reasoning requires a remand for reconsideration of this aspect of the Amended Final Determination and a reasoned explanation of why it chose to exclude sales outside of the ordinary course of trade.

### III. CONCLUSION

Plaintiff has not established its right to relief under which the court could order Commerce to recalculate the constructed value profit rate for Thai I-Mei based on the TFFA data. Commerce's decision to use data from sales in Canada by Rubicon Group and Union Frozen Products, rather than the TFFA data, for the constructed value profit rate calculation is based on findings that are supported by substantial evidence on the record of this case. The arguments by which plaintiff challenges that decision are unavailing. Commerce's statutory construction of clause (iii), under which the use of data from third country sales is not prohibited as a matter of law when constructed value profit is calculated, was reasonable. Although the court is unable to conclude that Commerce conducted an investigation that was adequate in all respects to fulfill its statutory obligation with respect to the profit cap requirement imposed by clause (iii), plaintiff did not present arguments, and did not exhaust its administrative remedies, so as to allow it to bring a challenge to that aspect of the contested determination.

Commerce's decision to calculate Thai I-Mei's profit rate based on only those sales by Rubicon Group and Union Frozen Products that occurred in the ordinary course of trade was not supported by adequate reasoning in the Amended Final Determination or the accompanying Decision Memorandum. The court, therefore, will direct Commerce to reconsider this aspect of

the Amended Final Determination and to submit remand results conforming with this Opinion

and Order.

## IV. ORDER

For the reasons stated in this Opinion and Order, plaintiff's motion for judgment on the

agency record is granted in part and denied in part, and it is hereby

**ORDERED** that the determination set forth and published as the *Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from Thailand*, 70 Fed. Reg. 5,145 (Feb. 1, 2005) ("*Amended Final Determination*") is hereby remanded to the United States Department of Commerce ("Commerce") for further proceedings consistent with the requirements of this Opinion and Order; it is further

**ORDERED** that Commerce shall reconsider its decision to exclude from the calculation of Thai I-Mei's constructed value profit rate the data derived from third country sales of Rubicon Group and the Union Frozen Products Co., Ltd. that occurred outside of the ordinary course of trade; it is further

**ORDERED** that Commerce, in preparing a remand determination, either shall recalculate Thai I-Mei's constructed value profit rate by including in the calculation the data derived from third country sales of Rubicon Group and the Union Frozen Products Co., Ltd. that occurred outside of the ordinary course of trade or, alternatively, shall provide in the remand determination a justification that addresses the objections discussed in this Opinion and Order and that sets forth reasons sufficient to support a conclusion that a calculation of the constructed value profit rate that excludes the data derived from sales of Rubicon Group and the Union Frozen Products Co., Ltd. occurring outside of the ordinary course of trade is supported by substantial evidence on the record and is otherwise in accordance with law; and it is further

**ORDERED** that Commerce shall have ninety (90) days from the date of this Order to complete and file its remand determination; plaintiff shall have thirty (30) days from that filing to file comments; and defendant shall have twenty (20) days after plaintiff's comments are filed to file any reply.

> /s/ Timothy C. Stanceu
> Timothy C. Stanceu
> Judge

Dated: March 12, 2007
New York, New York